# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>161 Rainbow Drive, Grand Junction, CO 81503, more<br>fully described in Attachment A | )<br>)<br>)<br>)<br>)    Case No. 22-sw-00249-GPG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____State and_____ District of _____Colorado_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with the Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/ Blake McClellan
*Applicant's signature*

Blake McClellan, TFO, DEA
*Printed name and title*

☒ Sworn to before me and submitted, attested to, and acknowledged by reliable electronic means

☐ Sworn to before me and signed in my presence.

Date: ____2/24/22____

City and state: __Grand Junction, Co__

_____
*Judge's signature*

Gordon P. Gallagher-USMJ
*Printed name and title*

## AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT

I, Blake McClellan, a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), being duly sworn, do hereby depose and state as follows:

## AFFIANT'S BACKGROUND

1.      I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations and make arrests for offenses set forth in in Title 18, United States Code, Section 2516.

2.      I am currently employed by the Mesa County Sheriff's Office as an Investigator assigned to the Western Colorado Drug Task Force ("WCDTF") and was so at all times relevant to the facts contained herein.  I have been employed as a sworn peace officer for over twenty-three years and was assigned to the WCDTF in November of 2012.  The primary function of the WCDTF is to investigate drug organizations.  In November 2014, I was assigned to the DEA as a federally deputized TFO.  I compiled all of the information contained herein in the course of a criminal investigation, including by speaking with fellow law enforcement officers and citizens.

3.      I have personally written and served numerous search warrants for residences, computers, vehicles, and other items used in the trafficking of controlled substances; written arrest affidavits for persons suspected of trafficking in controlled substances; interviewed numerous persons about the use and distribution of controlled substances; written affidavits for the interception of telephonic communication; and completed investigations into money laundering and financial crimes.  As a result of this experience, I am familiar with the ways in which controlled substance traffickers conduct

business, including methods of importing, manufacturing and distributing narcotics; methods of laundering the profits gleaned from the sales of controlled substances; and the use of telephonic devices and other telecommunications methods to conduct transactions.

4.     While participating in numerous investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources.  Because of these investigations, training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle and safeguard controlled substances, distribute controlled substances, and collect and launder the proceeds generated by their sale, manufacture and distribution.  In addition, I have learned that drug traffickers use various types of electronic communication devices to code, encrypt, conceal, and maintain records to facilitate their trafficking activities. Through this training and experience I have also learned the following:

a.     Persons involved in large-scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from drug trafficking activities.

b.     Drug traffickers often maintain (in either physical or electronic format) negotiable monetary instruments; transaction ledgers; U.S. currency, electronic currency (Bitcoin, etc.); controlled substance supplier lists; correspondence; drug-related notations; logs; receipts; journals; books; records; and other documents noting the price, quantity, and/or times when controlled

substances were obtained, transferred, sold, distributed, and/or concealed.  I have further learned that drug traffickers also maintain drug paraphernalia such as weighing devices, marijuana cultivation paraphernalia, miscellaneous containers, measuring devices, pipes, straws, and other items which are used to facilitate the distribution and/or consumption of controlled substances.

c.      Drug traffickers earn large sums of money and often try to legitimize these large sums of money.  In order to do this, drug traffickers attempt to secret, transfer, and conceal the illicit money by 1) placing assets in names other than their own to avoid detection while maintaining control; 2) hiding the money (and related documents) in businesses, safes, and associated bank accounts and safe deposit boxes; 3) using the money to buy assets that are difficult to trace; or 4) depositing and commingling drug proceeds with legitimate funds in an effort to conceal the drug proceeds.

d.      Drug traffickers commonly possess firearms to protect themselves from criminal associates who may rob them of their narcotics and or proceeds from illegal drug sales, in addition to aid in their flight and or resistance to law enforcement.

e.      Drug traffickers engaged in money laundering frequently retain records of their transactions within their places of business.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, electronic communications, and other records.

f.      Drug traffickers often maintain records and other evidence for long periods of time, particularly when they are involved in ongoing criminal conduct

over a long period of time.  There are many reasons why drug traffickers maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer related evidence.  However, that evidence may still be retrievable by a trained forensic computer expert.

       g.     Net worth/source and application of funds analyses can often show that a suspect's known expenditures and/or accumulation of assets substantially exceeds his or her legitimate sources of income, thus providing evidence that the suspect is engaged in illegal activities (such as drug trafficking or fraud) which result in the generation of monetary proceeds.  The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, with his/her net worth at the approximate time of his/her arrest (and potentially at intervals in the interim).  The source and application of funds analysis focuses on the

suspect's expenditures during the period of purported illegal activities and compares such expenditures with his/her legitimate sources of income. Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year). Such analysis often shows changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity. This can provide evidence of profit-generating illegal activities (e.g., drug trafficking or fraud), as compared to a person earning income from legitimate sources. Evidence of a defendant's expenditures, asset accumulation, financial lifestyle, net worth/source and application of funds analyses, and underlying financial documents necessary for such analyses are admissible evidence under federal case law in drug trafficking and money laundering cases. This establishes the need for such documents to be taken during the execution of a search warrant.

h. Drug traffickers are not unlike other members of society in that they rely on credit and debit cards to make financial payments. Records relating to the use of such cards can provide valuable information to the investigation by establishing the amount of money that is being spent by the suspects, and it may further identify businesses which are associated with the illegal activities.

i. Drug traffickers deal in currency and store currency in conveyances, homes, safe deposit boxes, safes and at business sites to conduct transactions. Furthermore, a Currency Transaction Report ("CTR") (IRS Form

4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000.  This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials.  It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashier's checks or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days to avoid the CTR filing requirement.  Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them to avoid handling the currency themselves.  Finally, it is not uncommon for drug traffickers to try to circumvent these requirements and "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

j.      Drug traffickers also use financial habits designed to minimize and hide a paper trail.  Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates, or business entities to avoid detection of these assets by government agencies, especially the Internal Revenue Service.  Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them.

k.      Individuals who deal in illegal controlled substances also frequently take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product.  These individuals usually maintain these photographs in their possession or in locations where they have access and

6

remaining

control.  Locations related to distribution of controlled substances also often maintain surveillance systems to monitor and protect the locations where drug traffickers store controlled substances or proceeds therefrom, and/or maintain evidence of ongoing illegal activity and criminal associations.

l.      Drug traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband.  Analysis of travel records can reveal other locations related to the distribution of illegal drugs or the payment of related proceeds.  Furthermore, evidence of travel can also assist in the identification of assets and/or monetary expenditures associated with the illegal proceeds of drug transactions.

5.      The information contained within this affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, each and every fact known concerning this investigation has not been included.  This document contains only the facts believed necessary to establish probable cause that evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1), as specified in Attachment B of this affidavit, are located at the location described in Attachment A of this affidavit.

**PROBABLE CAUSE**

6.      On February 10, 2022, I was contacted by a source of information (hereinafter referred to as "SOI") regarding a criminal associate.

a.      The SOI is known to me but wishes to remain anonymous.  I know from prior investigations that the SOI is involved in the use and distribution of

7

controlled substances and has admitted to me that s/he has distributed methamphetamine in the past and has distributed fentanyl more recently.  The SOI has a criminal history that includes arrests for DUI, shoplifting, and criminal impersonation.  To my knowledge, the SOI has not provided me with any information or made any statements that have proven to be false.

b.      The SOI informed me that a subject, whom the SOI referred to as "Jake," was planning a trip to Tucson, Arizona to pick up "4 or 5 boats" to bring back to Grand Junction.  The SOI advised based on their relationship, that the SOI knows the reference to "boats" was a reference to "blues."  The SOI stated s/he has obtained "blues," which the SOI acknowledged were pills, from Jake in the past and knows him to be a local source of supply for the pills.

c.      I know from my training and experience that a "boat" is a common street reference for 1,000 pills, and "blues" is a common street name for counterfeit trademark opiate pills containing fentanyl.  These pills are typically small round blue pills, stamped with an "M" on one side and a "30" on the other. I also know subjects involved in the use and distribution of illegal narcotics will often communicate in code or use vague terminology to avoid detection by law enforcement.

d.      The SOI did not know Jake's last name but stated that Jake lives at 161 Rainbow Drive (hereinafter the "TARGET LOCATION") with a female the SOI identified as Caitlin.  The SOI also stated Jake drives a gold colored sedan. The SOI advised s/he communicates with Jake regarding the pills via phone, and that Jake utilizes cellular telephone number 970-208-2946.

8

7.      A check of commercial databases for phone number 970-208-2946, identified the subscriber to this number as Jake RODRIGUEZ.  I presented a photo of RODRIGUEZ to the SOI.  The SOI advised the subject looked like "Jake," but explained that "Jake" does not have a mustache and has longer hair than the subject in the photo. Based on this explanation and other information obtained, I believe that "Jake" is in fact Jake RODRIGUEZ.  I reviewed criminal history records for RODRIGUEZ.  Those records show that RODRIGUEZ has been arrested in the last 12 months for possession of controlled substances.

8.      I also checked local law enforcement indices for TARGET LOCATION. Those records showed that a Caitlin GRANDONA has the TARGET LOCATION as a listed address.  I presented a photo of GRANDONA to the SOI, who advised that was the Caitlin they were referring to.  The SOI stated GRANDONA is a drug user and that the SOI has provided GRANDONA with "blues" in the past.

9.      A pole camera was deployed in a position to observe any traffic entering or exiting the property at the TARGET LOCATION.  On February 22, 2022 (the date the pole camera was deployed), at approximately 3:27 p.m., a gold-colored Ford sedan arrived and parked on the street in front of the property.

   a.      A records check of the vehicle showed that it was registered to a person named Cato Johnson.  Johnson is a known criminal associate of Alizon Lopez, who is suspected to be involved in the use and distribution of counterfeit trademark opiate pills containing fentanyl.  Lopez was the subject of a drug trafficking investigation in August 2020 at the TARGET LOCATION.  However,

charges were never filed against Lopez.  Lopez is not believed to reside at the TARGET LOCATION at this time

    b.      The male driver of the sedan appeared to walk to TARGET LOCATION and then returned to the vehicle approximately fifteen minutes later. He walked to the passenger side where he removed his baseball hat and appeared to take something out of the interior band.  The male then handed the female passenger something.  A short time later, the passenger appeared to begin smoking something off a piece of what appeared to be aluminum foil.  I know from my training and experience that aluminum foil is commonly used to smoke fentanyl pills.

    c.      A few minutes later the vehicle left the area.  Based on the view from the pole camera, the male driver appeared to be Johnson, but agents could not identify the female passenger.

10.    On February 23, 2022, at approximately noon, a gold-colored Chevrolet SUV pulled into the TARGET LOCATION.

    a.      A records check showed the vehicle was registered to Kimberly Selan at 1181 Lowell Court #3, Grand Junction, Colorado.  Since September 2021, Selan has been the subject of an active investigation regarding the use and distribution of methamphetamine and counterfeit trademark opiate pills containing fentanyl.

    b.      The pole camera footage did not depict anyone exiting the vehicle. However, I noted that during that time, the pole camera footage was skipping and could have missed a person exiting the vehicle.  Approximately fifteen minutes

after the vehicle arrived, a female (whom I believe was Selan) walked from the direction of the residence at the TARGET LOCATION back to the vehicle, carrying a tan colored purse.  The female also had a dog with her.  The female and dog entered the vehicle and left northbound on Rainbow Drive.

11.     Mobile surveillance was established to attempt stop the vehicle, believed to be driven by SELAN.  The vehicle was not located in transit.  Approximately forty-five minutes after it departed the TARGET LOCATION, the vehicle was observed parked at 1181 Lowell Court.  At that time, the WCDTF began surveillance at 1181 Lowell Unit #3.  Approximately thirty minutes later, a female, later identified as Jenna Lee left the unit.  Lee walked over to another location, where she got into a blue Ford truck.  The truck then drove across the street from where Lee entered, dropped her off at a grocery store, and then left the area.  An investigator observed Lee purchase tinfoil at the store.  As indicated above, I know that people who use and sell fentanyl pills often use tin foil to assist in heating the fentanyl for smoking.

12.     The blue Ford truck was contacted on a traffic stop.  The driver was identified as Audray Cosslett and the passenger was identified as Brooke Ramsey.  During the stop, officers discovered Cosslett and Ramsey were in possession of a fentanyl pill.  A detective arrived on the scene and spoke with Cosslett and Ramsey, after advising them of their *Miranda* rights.  Both Cosslett and Ramsey admitted they had purchased approximately 30 fentanyl pills from a female they referred to as "Jenna" just prior to being stopped.  They explained that they had picked up "Jenna" in the area surveillance had observed Lee enter the vehicle.  Based on these statements, I believe that "Jenna" is Jenna Lee.

13.     Later that same day, Lee was surveilled with Selan in a parking lot. Officers contacted them both.  It appeared the same dog observed with Selan at the TARGET LOCATION was with her at the time of the stop.  Lee was arrested on state distribution of controlled substances charges.  After receiving a *Miranda* advisement, Lee agreed to speak with officers.  Lee explained that earlier in the day Selan told her to take a bag with fentanyl pills in it and deliver them to a female in a blue truck.  Lee explained that after selling the pills to the females in the blue truck, she went and purchased tin foil to take back to Selan's house.  Once there, she used the tin foil to smoke a fentanyl pill at 1181 Lowell Court Unit #3.  Lee also stated that she observed methamphetamine and additional fentanyl pills at Selan's house.

14.     A search of Lee revealed 8 suspected fentanyl pills and approximately 3.5 grams of suspected methamphetamine in her vagina.  Selan was also searched on this contact and was found to be in possession of 4 suspected fentanyl pills, and .5 gram of heroin.  Approximately three-quarters of an ounce of suspected methamphetamine, 42 pills marked "EP905" (which according to drugs.com would indicate are Lorazepam), 2.4 grams of suspected heroin, and $448 USC were also found in Selan's vehicle.

15.     Officers later obtained and executed a search warrant for Selan's residence.  During a search of that location, officers discovered, among other things, several additional suspected fentanyl pills, drug paraphernalia and a receipt/invoice dated November of 2021 with an address of the TARGET LOCATION.

16.     Based on the foregoing, I believe that RODRIGUEZ was the source of supply for the pills, and possibly the other controlled substances possessed and distributed by Selan and Lee.  I also believe there is likely to be a considerable amount of

12

fentanyl pills present at the TARGET LOCATION as well as further evidence, fruits, and instrumentalities of RODRIGUEZ's drug trafficking.

17.     On February 23, 2022, DEA Special Agent Kevin Doheny and I spoke to the SOI again.  The SOI advised s/he had been to see RODRIGUEZ since he returned from Tucson, Arizona, and he stated he had actually picked up 8,000 fentanyl pills.  The SOI said s/he saw a bag containing a considerable quantity of fentanyl pills and believed RODRIGUEZ was still in possession of fentanyl pills.

## SEIZURE AND SEARCH OF ELECTRONIC DEVICES

18.     In this affidavit, the terms computers, or digital storage media or devices are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical storage media.

19.     I know from my training and experience that computers are frequently used by drug traffickers to store information related to their activities, communicate with customers, suppliers, and co-conspirators, and otherwise facilitate their drug trafficking and/or money laundering activities.

20.     I submit that if computers or storage media are found at the areas described above and in Attachment A, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic

records, as explained below, might take a form that becomes meaningful only upon

forensic analysis.  I am aware that modern cellular telephones, or smart phones, operate

in many respects as a computer, with internet access, and function at times as a person's

computer historically would have.

21.     Based on my and my colleagues' knowledge, training, and experience, I

know that a powered-on computer maintains volatile data.  Volatile data can be defined

as active information temporarily reflecting a computer's current state including registers,

caches, physical and virtual memory, network connections, network shares, running

processes, disks, and printing activity.  Collected volatile data may contain such

information as opened files, connections to other computers, passwords used for

encryption, the presence of anti-forensic tools, or the presence of programs loaded in

memory that would otherwise go unnoticed.  Volatile data and its corresponding

evidentiary value is lost when a computer is powered-off and unplugged.

22.     Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when

files have been deleted, they can be recovered months or years later using forensic tools.

This is so because when a person "deletes" a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the storage medium until it is

overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may

reside in unallocated space or slack space—that is, in space on the storage medium that is

not currently being used by an active file—for long periods of time before they are

14

overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

23.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from30 m a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

24.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

25.     The analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crimes commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

26.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at the location described in Attachment A.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the locations.

28.     Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

29.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:

    a.    The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

    b.    The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and
would be impractical and invasive to attempt on-site.

      c.     Technical requirements.  Computers can be configured in several
different ways, featuring a variety of different operating systems, application
software, and configurations.  Therefore, searching them sometimes requires tools
or knowledge that might not be present on the search site.  The vast array of
computer hardware and software available makes it difficult to know before a
search what tools or knowledge will be required to analyze the system and its data
on-site.  However, taking the storage media off-site and reviewing it in a
controlled environment will allow its examination with the proper tools and
knowledge.

      d.     Variety of forms of electronic media.  Records sought under this
warrant could be stored in a variety of storage media formats that may require off-
site reviewing with specialized forensic tools.

      e.     Need to review evidence over time and to maintain entirety of
evidence.  I recognize the prudence requisite in reviewing and preserving in its
original form only such records applicable to the violations of law described in
this Affidavit and in Attachment B in order to prevent unnecessary invasion of
privacy and overbroad searches.  I advise it would be impractical and infeasible
for the Government to review the mirrored images of digital devices that are
copied as a result of a search warrant issued pursuant to this Application during a
single analysis.  I have learned through practical experience that various pieces of
evidence retrieved from digital devices in investigations of this sort often have

unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachment A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the

20

search warrant, and to maintain and to review the data in the control and custody

of the Government and law enforcement at times deemed necessary during the

investigation, rather than minimize the content to certain communications deemed

important at one time.  As with all evidence, the Government will maintain the

evidence and mirror images of the evidence in its custody and control, without

alteration, amendment, or access by persons unrelated to the investigation.

47.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when

persons executing the warrant conclude that it would be impractical to review the media

on-site, the warrant I am applying for would permit seizing or imaging storage media that

reasonably appear to contain some or all of the evidence described in the warrant, thus

permitting its later and perhaps repeated examination consistent with the warrant.  The

examination may require techniques, including but not limited to computer-assisted scans

of the entire medium, that might expose many parts of a hard drive to human inspection

in order to determine whether it is evidence described by the warrant.

48.     Because several people may share the area described in this affidavit, it is

possible that the area will contain computers that are predominantly used, and perhaps

owned, by persons who are not suspected of a crime.  If it is nonetheless determined that

it is possible that the things described in this warrant could be found on any of those

computers or storage media, the warrant applied for would permit the seizure and review

of those items as well.

49.     I know from training and experience that digital storage devices can be

very large in capacity, yet very small in physical size.  Additionally, I know from training

and experience that those who are in possession of such devices also tend to keep them

21

on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs, and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

50.     The Device(s) may include an Apple product that is currently locked and may be equipped with "Touch ID."  A Touch ID sensor, a round button, on an iPhone or iPad, can recognize fingerprints.  The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.  The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone.  If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.  Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful.  For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to

any Apple devices found at the Subject Premises while executing the search warrant.

The government may not be able to obtain the contents of the Apple devices if those

fingerprints are not used to access the Apple devices by depressing them against the

Touch ID button.  Although I do not know which of the ten finger or fingers are

authorized to access on any given Apple device and only five attempts are permitted, I

know based on my training and experience that it is common for people to use one of

their thumbs or index fingers for Touch ID, and in any event all that would result from

successive failed attempts is the requirement to use the authorized passcode or password.

51.     In addition, I know in my training and experience that many other mobile

device manufactures have their own version of Touch ID—that is, a fingerprint

recognition feature that the device's user can program and use to unlock the device.  For

instance, I know that Google Pixel phones and Google Pixel XL phones have a

fingerprint sensor that can be used to unlock the device.  Similarly, Samsung, LG, HTC,

and other manufacturers also have devices with fingerprint sensors.

52.     Similarly, in my training and experience I know that some applications

loaded onto mobile devices or other electronic devices may be secured by the user with a

thumbprint or fingerprint.  Common among these types of applications are applications

such as mobile banking apps or other financial applications, password storage

applications, and secure communications apps, among others.

53.     Due to the foregoing, I am informing the court that law enforcement

intends to press the fingers (including thumbs) of individuals found at the TARGET

LOCATION to the Touch ID sensor or other device fingerprint sensor of the seized

device, to the extent a visual inspection of those devices reveals that the device has a

fingerprint sensor—located pursuant to the warrants requested by this Affidavit for the purpose of attempting to unlock the device via Touch ID or other fingerprint sensor in order to search the contents (including applications) as authorized by this warrant.

54.     Several law enforcement agencies—federal, state, and local—may be involved in the searches of the SUBJECT LOCATIONS.  As a result, digital devices may be seized and reviewed by analysts from a variety of agencies.

55.     If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established. The filter team will have no previous or future involvement in the investigation of this matter.  The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege.  At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys.  The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review.  If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team.  If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## CONCLUSION

56.     Based on the above information, I submit that there is probable cause to believe that the TARGET LOCATION listed in Attachment A is being used to receive, store, and sell illegal controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

57.     I further submit that there is probable cause to believe that evidence of such crimes, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime, will be located at the TARGET LOCATION.

58.     WHEREFORE, I respectfully request a search warrant for the TARGET LOCATION, including all outbuildings, detached garages, vehicles, and persons located on the curtilage on the property.


_s/ Blake McClellan_____
Blake McClellan
Task Force Officer
Drug Enforcement Administration


Subscribed, attested to, and acknowledged by reliable electronic means on February _____, 2022.
   24

_____
Gordon P. Gallagher
United States Magistrate Judge


  Affidavit reviewed and submitted by AUSA Jeremy Chaffin.

**ATTACHMENT A**
**Description of Location to be Searched**

The search will include all persons, all rooms, attics, basements, and all other parts of the property, as well as surrounding grounds, garages, vehicles, storage rooms, or outbuildings of any kind, attached or unattached, located thereon and under the dominion and control of the occupants, namely Jake RODRIGUEZ and Caitlin GRANDONA, at 161 Rainbow Drive, Grand Junction, Colorado, (hereinafter the "TARGET LOCATION").  A search of the property assessor's site shows the TARGET LOCATION is assigned parcel number 2943-311-27-001, owned by Steve Grandona, with an address of 161 Rainbow Drive, Grand Junction, CO 81503.

The TARGET LOCATION is described as a one-story home.  The driveway leading to the residence is on the north side of the property.  There is a mailbox on the south (left) side of the driveway.  The access to the property is blocked by a wooden fence with a gate at the driveway entrance.  Upon passing the driveway gate, there is a chain link fence that runs along the driveway on the south side of the driveway.  The door to the residence faces north.  There are windows on the residence facing east.  On the east side of the property, between the residence and wooden fence, there is a shed with a red roof.  North of the shed, there are makeshift structures next to flower beds.  The color of the house is white with a red roof.  At the west end of the driveway there is a large white detached garage with a red roof.  The detached garage paint and red roof match the residence. Below is a picture of the TARGET LOCATION; however, the trees are no longer there.





### ATTACHMENT B
### Description of Items to be Seized and Searched

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 to include:

1. Controlled substances, including methamphetamine, heroin, fentanyl pills, any pills that have the appearance of 30mg Oxycodone pills, or pills with markings "EP905."

2. Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

3. Any substance used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

4. Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, narcotics customer lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances..

5. Indicia related to occupancy, residency and or ownership of property, premises, or vehicles.

6. Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms and ammunition.

7. Financial records, including expenses incurred in obtaining the equipment and items necessary for the cultivation and/or distribution of controlled substances, income derived from the sales of controlled substances, pay-owe sheets, records of legitimate income (to serve as a baseline to discern excess or unexplained income consistent with proceeds derived from drug trafficking) and general living expenses.

8. Passports, travel documents, and other records indicating travel.

9. Concealed and/or aftermarket compartments in vehicles present at the TARGET LOCATION, which may be used to import or transport controlled substances.

10. United States currency, precious metals, jewelry and financial instruments, including mortgage notes, stocks, and/or bonds representing drug proceeds.

11. Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

12. Computers, cellular telephones and/or portable telephones, pagers, iPods, and similar devices, including any electronic data stored or saved therein.

13. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled substances.

14. Devices used to communicate with other individuals involved in the manufacture and distribution of controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

15. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

16. Devices, equipment and maps used to identify and/or mark potential sites and for land navigation, to include both tangible media and electronic media, such as GPS devices, maps, charts, drawings and written directions or instructions related to areas suspected of containing fentanyl distribution operations.

17. Assigned telephone number for any and all telephone, cell phones and pagers found in the area, along with telephone toll records, papers, notebooks and other items documenting the purchase, acquisition or distribution of controlled substance, and communications among co-conspirators.

18. For the electronic devices (hereinafter COMPUTERS):

    i.    evidence of who used, owned, or controlled the COMPUTERS such as logs, registry entries, configuration files, saved usernames and passwords,

documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

ii.   evidence of software that may allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.   evidence of the lack of such malicious software;

iv.   evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

v.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

vi.   evidence of the times the COMPUTERS were used;

vii.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

viii.   evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the computer user;

ix.   contextual information necessary to understand the evidence described in this attachment;

x.   volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

xi.   records and information, including texts, emails, photographs, or videos, of or about controlled substances or people possessing, obtaining, distributing, or using controlled substances or holding firearms;

xii.   records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.   information, notes, documents, records, photographs, videos, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Sections 841(a)(1) or 846.

xiv.    Items otherwise described in this attachment but contained on an electronic device of any sort.

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of JAKE RODRIGUEZ or the possessor of the device onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also hold the device(s) found at the TARGET LOCATION in front of the face of JAKE RODRIGUREZ or the possessor the device to activate the facial recognition feature; and/or hold the device(s) found at the TARGET LOCATION in front of the face of JAKE RODRIGUEZ or the possessor of the device to activate the iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Personnel from federal, state, and local law enforcement agencies may assist in executing this warrant and in the search of digital devices.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.